1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

MIAMI DIVISION



IN RE:  AMERICAN AIRLINES       )
FLIGHT 331,                     ) Case No.
                Defendant.      ) 10-20131-CV-LENARD

The videotaped evidence deposition of JEFFREY E. COE, M.D., Ph.D., called for examination, taken pursuant to the Federal Rules of Civil Procedure of the United States District Courts pertaining to the taking of depositions, taken before CATRICE M. PRINCE, CSR No. 84-003765, a Notary Public within and for the County of Cook, State of Illinois, and a Certified Shorthand Reporter of said state, at Suite 110, 22 North Morgan Street, Chicago, Illinois, on the 11th day of September, 2012, commencing at 11:33 a.m.

COPY



WWW.USLEGALSUPPORT.COM
888-311-4240

5

```
 1              JEFFREY E. COE, M.D., Ph.D.,
 2   called as a witness herein, having been first duly
 3   sworn, was examined and testified as follows:
 4                    DIRECT EXAMINATION
 5   BY MR. MINER:
 6        Q.   Good morning, sir.  Could you please
 7   state your name.
 8        A.   It's Jeffrey Coe.  That's C-o-e.
 9        Q.   And, Dr. Coe, my name is Curt Miner, and
10   I'm an attorney for the plaintiff in this case,
11   Bobby Ruff, and I'm going to have a few questions
12   for you this morning about your evaluation of
13   Mr. Ruff, but first, I'd like to hear a little bit
14   about your background.  Could you start by telling
15   us what your educational background is?
16        A.   I'm a physician, and I received my
17   medical degree from the University of Chicago
18   Medical Center here in Chicago in 1970.  I did an
19   internship and first year of residency at the
20   University of Michigan Medical Center.  I began
21   working in my area, which is occupational medicine.
22             I went back to graduate school in 1985
23   and received a Ph.D. degree in occupational
24   medicine from the University of London in London,
25   England.  I became a board certified specialist in
```

1  occupational medicine.  The date of my board
2  certification in this field is 1991.
3      Q.    How long have you now been practicing in
4  the area of occupational medicine?
5      A.    It's been about 30 years all together.
6      Q.    And what does that term mean,
7  occupational medicine?
8      A.    Well, occupational medicine is the
9  specialty within medicine that deals with the
10 health of people at work so the areas of special
11 expertise, of special training of an occupational
12 medicine specialist are injuries or illnesses
13 generally arising from a workplace, their
14 diagnosis, their causation, the appropriate
15 treatment for these types of injuries or illnesses,
16 the assessment of disability from workplace
17 injuries or illnesses and then rehabilitation
18 issues, the assessment of the ability of a person
19 to go back to work, what type of work they can do,
20 whether they need work restriction, work
21 modification, vocational counseling or retraining.
22 That's most of occupational medicine.
23         There is another part of my specialty
24 that deals with health and safety rules and
25 procedures in workplaces.  So this is occupational

1  medicine.
2     Q.   And do you have a particular office that
3  you practice medicine out of?
4     A.   I do.  I have a specialty practice in
5  occupational medicine here in Chicago.  It's called
6  Occupational Medicine Associates of Chicago.  It's
7  located in the downtown Chicago area.  It's where I
8  am during this deposition today.
9     Q.   Okay.  Is that where you saw and gave an
10 evaluation of Bobby Ruff?
11    A.   That's correct.  That's where Mr. Ruff
12 came to see me for the purpose of an evaluation in
13 June of 2010.
14    Q.   Okay.  I'd like to turn to that now.
15 When exactly was it that you did an evaluation of
16 Mr. Ruff?
17    A.   It was on June 3rd of 2010.
18    Q.   And as part of an evaluation, do you
19 take a general history from your patient to learn
20 about what sort of accident or incident they have
21 been involved in?
22    A.   Yes, that's a customary practice.  So
23 the first step in any type of evaluation for an
24 injury or for an illness is to find out what
25 happened, what a patient felt, what they

1  experienced, that is the history.  That's what I
2  did in Mr. Ruff's case.
3       Q.    Okay.  And we've heard from Mr. Ruff
4  **about his experience.  Can you give us an overview**
5  **of the history that you obtained from Mr. Ruff as**
6  **part of your evaluation?**
7       A.    I'd be glad to, and I'll be brief about
8  it.
9            Mr. Ruff told me that he was a passenger
10 on an American Airlines flight.  It was No. 331.
11 It was on December 22nd of 2009, and he told me
12 that he then had limited recall of the immediate
13 events of the accident.  That would be the airplane
14 breaking apart.
15           He told me that his memory was of having
16 some bleeding from his face, noting bleeding from
17 his face, and being assisted out of the airplane by
18 his wife smelling aviation fuel, as he described it
19 to me, stepping out of the fuselage, which was
20 broken open out on to the wing and then down on to
21 the beach in Kingston, Jamaica.  He told me that he
22 recalled being picked up by a van and taken to a
23 medical facility.  He told me that he did recall
24 being evaluated.  He said that there was a
25 laceration of his face.  It was cleaned, and some

1  sutures were put in place.  He told me that he did
2  recall having some x-rays taken, and then he stayed
3  in Jamaica for about two weeks, and he told me that
4  he did see a doctor the next day in Jamaica.  And
5  he did recall feeling pain in his face at that
6  laceration site.  He said that the doctor changed
7  the dressings on his face, gave him some
8  medication.  He stayed in Jamaica for a few weeks
9  and then came back to his home, which is in the
10 Kansas City area where he had additional medical
11 treatment.  So that's in brief summary form the
12 history that he gave to me.
13      Q.   Okay.  And did you also obtain from Mr.
14 Ruff information about any medical treatment he had
15 received when he returned home from Jamaica to
16 Kansas City, Missouri?
17      A.   Well, I did.  He told me, as I mentioned
18 to you, that when he got back to Kansas City, he
19 sought treatment.  He said he went to his family
20 doctor.  He said that was a Dr. Boyd, B-o-y-d.  He
21 said that he complained to Dr. Boyd about pain in
22 his neck and pain in his back and head pain.  He
23 said that after examination, Dr. Boyd referred him
24 to a neurologist, that's a medical specialist
25 dealing with nerve and nerve-related symptoms.

1   six months after his accident.

2   Q.   And at that point in time when you
3   evaluated Mr. Ruff roughly six months after the
4   accident, did he still have complaints of pain or
5   other problems as a result of the accident?

6   A.   Well, he did. So at the time I saw him,
7   he had some ongoing complaints, and I'll go through
8   them for you. First, he told me that there was a
9   scar of the right side of his face in his right
10  eyebrow region, that's the scar from the laceration
11  where he had had the bleeding. That's the
12  laceration that had been sutured back in Jamaica.

13          He said that he had occasional pain at
14  that scar line and some localized tingling at the
15  scar on occasion.

16          Next, he told me that he had daily
17  headaches. He said that he noted the headaches
18  when he got up in the morning. He said that the
19  pain was primarily in the front of his head, and it
20  would over time radiate. It would move to the back
21  of his head. This is on both sides. This is what
22  is medically or more appropriately described as a
23  band like headache, a band around his head. That's
24  what he was describing to me.

25          He said that the medications that were

1  prescribed for him did lead to some improvement,
2  but it was limited.  It was temporary.  He did
3  continue to have headaches each day.
4          Mr. Ruff told me that he had pain in his
5  neck.  He had pain in his upper back.  He said it
6  was made worse by range of motion.  He told me that
7  the chiropractic therapies were helping his neck
8  and back pain, but they persisted.  He told me that
9  he had occasional tingling in both of his hands,
10 and he said that what he noticed was that that
11 tingling was brought on or was made worse by any
12 type of prolonged gripping.  So, for example,
13 prolonged driving, when he held the steering wheel
14 that he would notice tingling in his hands, when he
15 gripped anything forcibly.  So these were the
16 ongoing complaints that Mr. Ruff made to me when I
17 saw him in June of 2010.
18     Q.    And, Dr. Coe, as part of your evaluation
19 of Mr. Ruff, did you also obtain from him any past
20 medical history he had that may be relevant to the
21 complaints he was still experiencing?
22     A.    I did.  Now I asked him specifically
23 about prior problems in the areas that we've talked
24 about here today, so that would be his head, his
25 neck, his back, and his hands.  Mr. Ruff told me

1  duty in that occupation, that they had expressed
2  concerns regarding his ability to safely use
3  firearms, which were a fundamental or essential
4  portion of the qualification for his job.
5          He told me that he had returned to work.
6  Now, Mr. Ruff had gone back to work, but he was
7  working at a somewhat different position.  He told
8  me that he had been assigned to work for limited
9  hours, that's four hours per day, four days per
10 week at the medical center information desk.
11         In this position, he was no longer
12 supervising employees.  He was no longer a safety
13 responder.  He was not firearm qualified, and this
14 is all based on changes in his condition that had
15 developed following his accident of June of 2010 by
16 his report to me.
17     **Q.   Okay.  As part of your evaluation of**
18 **Mr. Ruff, Dr. Coe, did you also perform a physical**
19 **examination of him?**
20     A.   I did.  I carried out a physical
21 examination of Mr. Ruff.  This was focused on the
22 parts of his body for which he was reporting
23 complaints so I looked at his head.  I looked at
24 his spine, his neck, and back.  I looked at his
25 extremities.  So those were the areas that I

1   evaluated in this examination.
2       Q.   And when you performed the examination,
3   did you make any findings or make any observations
4   that were consistent with the injuries and
5   complaints that Mr. Ruff had made to you?
6       A.   Well, I did.  There were a number of
7   findings on this examination that I found to be of
8   significance in my evaluation of Mr. Ruff's
9   condition, and the findings that I'll describe for
10  you are also consistent with the symptomatic
11  complaints that he made and the nature of the
12  process, the injury and the treatments that he
13  described too.  So for example --
14      Q.   And what were those findings?
15      A.   Sure.  I'm sorry.  So, for example, he
16  had a scar on his face.  There was, as I measured
17  it, a two-inch hyperpigmented scar along the inner
18  border of his right eyebrow extending to the bridge
19  of his nose.  Hyperpigmented means slightly darker
20  than the surrounding skin color.  There was
21  thickening.  It was a slightly raised scar that was
22  present in that area.  There was decreased
23  sensation distal to the scar.  That means on the
24  lower edge of the scar, below the scar, there was
25  some decreased sensation.  So again, I found a

1  little below in the area of the flank above the hip
2  region. So there were additional trigger points in
3  his mid and lower back. Again, trigger points are
4  the characteristic finding, the Hallmark of
5  myofascial pain.
6          I moved on to measure the range of
7  motion of Mr. Ruff's lower back. Again, I did this
8  with my goniometer. I found that he could bend
9  forward, that's bending like he's going to touch
10 his toes. He could do that to 80 degrees. Normal
11 is 90 degrees. He could extend or bend backwards
12 to 25 degrees. Normal is 35 degrees. He could
13 bend to the right to 35 degrees. To the left to
14 30 degrees. Normal lateral bending, side to side
15 bending is 40 degrees. I would characterize this
16 for you as some mild residual stiffness in Mr.
17 Ruff's lower back.
18          He did complain of mid and lower back
19 pain with this range of motion testing.
20          Now, that concludes the findings that I
21 noted that were of significance on this exam.
22 These are the significant abnormal or unusual
23 findings.
24      Q.   Dr. Coe, as a result of those findings
25 in your physical examination, and as a result of

1 the history you obtained from Mr. Ruff, did you
2 reach some conclusions regarding the injuries he
3 had experienced?
4     A.    Well, I did. Based on all the sources
5 of information that I had in Mr. Ruff's case, and
6 again, just to summarize that for you, that
7 includes the history that he gave to me and what he
8 felt and what he experienced, the treatment that he
9 had undergone, based on this examination of Mr.
10 Ruff that I described for you that I performed in
11 June of 2010, again about six months after his
12 accident, I was able to conclude that Mr. Ruff had
13 suffered a facial laceration and contusion and
14 contusion and strain injuries to his neck and to
15 his back and to his head in the accident as he
16 described it that occurred on December 22nd of 2009
17 with residuals of myofascial pain, with residuals
18 of the facial scarring, with the residual of his
19 left arm nerve irritation, and then some other
20 neuropsychological issues that Mr. Ruff brought to
21 my attention; and these are the problems with
22 short-term memory deficits and difficulty with
23 cognition and judgment that he told me that he had
24 reported to his treating physicians.
25     Q.    And, Dr. Coe, did you reach any

1   conclusions as to whether those injuries that
2   you've just described were as a result of the
3   aircraft accident that Mr. Ruff was involved in on
4   December 22nd, 2009 on American Airlines Flight
5   331?
6        A.    I did.  And again, based on all the
7   sources that I've just described to you, the
8   history from Mr. Ruff, including his past medical
9   history, what he told me he felt and experienced
10  before the accident and what he experienced after
11  the accident, the examination that I carried out
12  six months after the accident.  So based on all
13  these sources of information, it's my opinion that
14  what I found when I examined Mr. Ruff on June 3rd
15  of 2010, the changes in his head, his face, his
16  neck, his back, his arm, and his reported
17  neurocognitive-type changes were all caused by the
18  airplane accident of December 22nd of 2009, and
19  this is again to a reasonable degree of medical
20  certainty, as I understand that term.
21       Q.    And, Dr. Coe, did you also reach any
22  conclusion as to whether Mr. Ruff continued to be
23  in need of any medical treatment as of June 3rd,
24  2010?
25       A.    I did.  It was my opinion, based on the

24

1  examination that I carried out, that Mr. Ruff was
2  in need of ongoing treatment.  Now, the treatment
3  that I would recommend for Mr. Ruff based on what I
4  found when I examined him was conservative medical
5  treatment.  I recommended that he go back and
6  maintain his relationship with his treating
7  physician and neurologist, that he continue to take
8  medications for control of symptoms like his
9  headaches, his neck pain, that he undergo
10 additional physical therapies that were helpful in
11 improving range of motion and controlling pain from
12 his neck and back.
13           I also recommended that he undergo an
14 additional test, that is an EMG and nerve
15 conduction test.  These are electrical tests of
16 nerves.  Here I was concerned about the nerves in
17 Mr. Ruff's left arm.  The nerves that I had found
18 to be somewhat abnormal on my physical examination,
19 again, in the distribution of his radial nerve.
20 That would be a useful or a helpful test to
21 determine what was bothering that nerve, where the
22 specific problem was located.
23           Finally, Mr. Ruff had expressed to me a
24 number of neuropsychological, neurocognitive
25 changes that he reported as having arisen after the

1  airplane crash.  These are the memory issues and
2  cognition thinking-type problems, judgment-type
3  problems.  These were troubling to him.  It was my
4  recommendation that he undergo more full, more
5  complete evaluation for those symptomatic
6  complaints, and that would include formal
7  neuropsychological testing and neuropsychological
8  consultation to try to determine what the nature of
9  this problem was, and to make that determination as
10 a guide to try to figure out what would help him,
11 medication, some type of cognitive therapy,
12 counseling or so on.  So those were my
13 recommendations in June of 2010.
14      Q.   And finally, Dr. Coe, as a doctor who
15 specializes in occupational medicine, did you also
16 reach any conclusion as to Mr. Ruff's ability to
17 return to work in the area of police or security
18 type work that he had been working in?
19      A.   I did.  And again, based on all these
20 sources of information, the history from Mr. Ruff,
21 my clinical examination of Mr. Ruff, and his
22 reported ongoing symptomatic complaints, it was my
23 conclusion, based on my background as an
24 occupational medicine physician, that Mr. Ruff was
25 not appropriate for return to security or to

1  raising test, he was able to raise his leg
2  bilaterally to 90 degrees?
3      A.    He was.  This is looking for something
4  pinching the nerves coming out of his lower back.
5  This test was normal.
6      Q.    And when you did the deep tendon
7  reflexes, they were brisk and bilaterally
8  symmetrical?
9      A.    Yes, and that's again a normal finding.
10     Q.    And finally with the lower extremities,
11 you found muscle strength to be intact and
12 symmetrical?
13     A.    Yes, it was.
14     Q.    And sensation was symmetrical to light
15 touch both right and left?
16     A.    Yes.  This is down in the legs, but yes,
17 that's correct.
18     Q.    Regarding the impressions from a --
19 regarding his neuropsychologic status, you weren't
20 provided any prior neuropsyche test or any
21 subsequent neuropsyche test, correct?
22     A.    No, I was not.  I had no prior
23 information about his psychological or mental
24 status.
25     Q.    And to this date, you have not been

```
 1   provided any further information, correct?
 2      A.   Yes, I've seen no additional information
 3   at this point about Mr. Ruff's mental,
 4   neuropsychological, or physical condition.
 5      Q.   So your examination was in June of 2010
 6   and today we're in September of 2012, correct?
 7      A.   Yes.  That's correct.
 8      Q.   So for a period of over two years, you
 9   have no knowledge from a medical perspective as to
10   how Mr. Ruff is doing, correct?
11      A.   That's correct.  I mean, I have no
12   information about Mr. Ruff after that date that I
13   examined him.
14      Q.   And had Mr. Ruff wanted to come see you,
15   you certainly would have obliged him and created
16   space for him in your calendar, correct?
17      A.   Oh, sure.  I mean, if there had been a
18   revisit either initiated by Mr. Ruff or by anyone
19   else, I would have been glad to see him again and
20   see any progress or any change.
21      MR. PALMER:  All right.  I don't have any
22   other questions for you, Doctor.
23      THE WITNESS:  Okay.
24
25                REDIRECT EXAMINATION
```