UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

MIAMI DIVISION

IN RE:  AMERICAN AIRLINES        )

FLIGHT 331,                      )  Case No.

              Defendant.    )  10-20131-CV-LENARD

    The videotaped evidence deposition of JEFFREY

E. COE, M.D., Ph.D., called for examination, taken

pursuant to the Federal Rules of Civil Procedure of

the United States District Courts pertaining to the

taking of depositions, taken before CATRICE M.

PRINCE, CSR No. 84-003765, a Notary Public within

and for the County of Cook, State of Illinois, and

a Certified Shorthand Reporter of said state, at

Suite 110, 22 North Morgan Street, Chicago,

Illinois, on the 11th day of September, 2012,

commencing at 10:30 a.m.

```
 1    PRESENT:

 2

 3

 4         COLSON HICKS EIDSON,

 5         (255 Alhambra Circle, Penthouse,

 6         Coral Gables, Florida 33134,

 7         (305) 476-7400), by:

 8         MR. CURTIS B. MINER,

 9              appeared telephonically on behalf of the

10              Plaintiffs Bobby Lee Ruff and

11              Monica Ruff;

12

13         RUMBERGER KIRK & CALDWELL,

14         (Brickell Bayview Centre,

15         80 Southwest 8th Street,

16         Miami, Florida 33130,

17         (305) 358-5577), by:

18         MR. GREGORY M. PALMER,

19              appeared telephonically on behalf of the

20              Defendant American Airlines.

21

22

23

24    REPORTED BY:   CATRICE M. PRINCE, CSR

25              CSR No. 84-003765.
```

3

I N D E X

JEFFREY COE, M.D., Ph.D.                EXAMINATION

DIRECT BY MR. MINER                          5

CROSS BY MR. PALMER                         25

REDIRECT BY MR. MINER                       33

NO EXHIBITS MARKED FOR IDENTIFICATION.

1      THE VIDEOGRAPHER:  This is Anthony Micheletto

2    representing U.S. Legal Support.  I am the operator

3    of this camera.

4        We are on the record on

5    September 11, 2012.  The time is 10:40 a.m., as

6    indicated in the video screen.

7        This is the videotaped deposition of

8    Jeffrey Coe, M.D., Ph.D., as being taken pursuant

9    to Federal Rules of Civil Procedure on behalf of

10    the plaintiffs.  We are at 22 North Morgan Street,

11    Chicago, Illinois.

12        This case is captioned, Monica Ruff

13    versus American Airlines, Case No. 10-20131-CV

14    Lenard.

15        Will the attorneys please identify

16    themselves for the record.

17    MR. MINER:  Curtis Miner on behalf of the

18    plaintiff, Monica Ruff.

19    MR. PALMER:  Greg Palmer on behalf of the

20    defendant, American Airlines.

21    THE VIDEOGRAPHER:  Our court reporter today is

22    Catrice Prince from U.S. Legal Support.  Please

23    swear in the doctor.

24           (WHEREUPON, the witness was duly

25           sworn.)

JEFFREY E. COE, M.D., Ph.D.,

called as a witness herein, having been first duly

sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. MINER:

Q.     Good morning, Doctor.  Could you first
please tell us your name.

A.     It's Jeffrey Coe, C-o-e.

Q.     And, Dr. Coe, as you know, my name is
Curtis Miner, and I represent the plaintiff in this
case, Monica Ruff.  I'm going to have a few
questions for you this morning about your
evaluation of Mrs. Ruff.

First, I'd like to get to know a little
bit about you though.  Could you tell me what your
educational background is?

A.     I'm a doctor of medicine.  I received my
medical degree from the University of Chicago
Medical School here in Chicago in 1970.  I later
did an internship and the first year of residency
in pediatrics, and then I switched into my current
specialty, which is occupational medicine.  I went
back to graduate school and received a Ph.D.
degree in occupational medicine from the University
of London in London, England in 1985.

1        I became a board certified specialist in

2    my field in 1991, and I've worked continuously in

3    occupational medicine for about the past 30 years.

4        Q.    And, Dr. Coe, can you give us a

5    description of what occupational medicine includes?

6        A.    I'd be glad to, and I think that would

7    be helpful because it's a somewhat usual medical

8    specialty for most people.  This is a board

9    certifiable medical specialty.

10        Occupational medicine is the specialty

11    within medicine that deals with the health of

12    people at work.  So the areas of special expertise

13    in training of an occupational medicine specialist

14    are injuries or illnesses usually arising from a

15    workplace, their causation, their diagnosis and

16    treatment, the rehabilitation and return to work

17    after work-related injuries, questions relating to

18    the assessment of disability following injuries or

19    illnesses, and then a lot of general issues

20    relating to health and safety in workplaces.  So

21    that's my specialty, which is occupational

22    medicine.

23        Q.    And, Dr. Coe, do you have a particular

24    medical practice that you are associated with, an

25    office that you're associated with?

A.    I do.  For the past 20 years, I've had my medical practice, which is called Occupational Medicine Associates of Chicago.  It is located here in Chicago.  It's where I'm sitting during this deposition today.

In this practice, I see patients.  I carry out a variety of physical examinations.  I do consulting and advising work.

Q.    Okay.  And that office is where you saw my client, Monica Ruff?

A.    Yes, that's where Monica came for the examination that I carried out in June of 2010.

Q.    Okay.  So let's turn to that.

On June of 2010, is that the first time you met Monica Ruff?

A.    Well, that's correct.  She came to my office on June 3rd of 2010.  That was the first time that I met her.

Q.    Okay.  And my understanding is that the purpose of your meeting with her was to evaluate essentially the status of her condition at that point in time as opposed to starting an ongoing medical treatment relationship with her, is that correct?

A.    Yes.  I think that's a correct summary.

1    I was not, and I am not her treating physician.   I

2    saw her for the purpose of evaluation to find her

3    condition at that point in time, and again, this is

4    June of 2010.

5         Q.    Okay.  And as part of your evaluation of

6    the patient, do you start by taking a general

7    history from them of what sort of experience or

8    accident they have been in?

9         A.    Yes, that's the standard procedure.   So

10   that's a customary practice, take a history from

11   the patient, ask questions about other related

12   issues, then carry out a physical examination, and

13   I did start with Ms. Ruff by taking a history.

14        Q.    Okay.  And I don't need you to go into

15   great detail on the history you took from her but

16   can you give us an overview of the history you

17   obtained from Monica Ruff regarding the accident

18   that she had been in?

19        A.    I'd be glad to, and I can briefly

20   summarize this for you.  It was my understanding

21   based on what Ms. Ruff told me in June of 2010 that

22   she had been involved in an accident on

23   December 22nd of 2009.  She was a passenger on an

24   airplane.  This was an American Airlines flight.

25   There was an accident.  She was able to exit from

1    the plane.

2              She told me that she had heard a bang.

3    She told me that her next memory was as she

4    described it startlingly wake in her seat.  She

5    said that there were no lights.  She said that she

6    smelled aviation fuel as she described it to me.

7    She said that she assisted her husband.  She was

8    able to exit from the plane through a broken

9    fuselage out on to a wing and then down on to the

10   beach.  This was in Kingston, Jamaica.

11             She told me that she was assisted at

12   that point and picked up and taken to a local

13   medical treatment facility where she was examined

14   in Kingston.  She told me she was experiencing

15   symptoms at that time.  She said that she had some

16   bleeding from her face, some swelling in the area

17   of her forehead, aches and pains and discomfort in

18   her head and neck.  She said that local treatment

19   was carried out in Kingston by emergency physicians

20   and by other physicians that she saw in the roughly

21   two weeks that she stayed in Jamaica.

22             And she said then she returned to her

23   home in Missouri where she had additional medical

24   treatment.  So that's in general the history that

25   she gave to me of what happened to her and what she

at least initially felt and experienced.

Q.   **Okay.  And did you also obtain from her her medical history after she returned to her home in Missouri as far as this sort of treatment she received for the injuries she had suffered in the accident?**

A.   Yes, I did.  I discussed that with Ms. Ruff, and again, to briefly summarize this, she told me that when she came back to Missouri, she had consulted with her family physician, that's a Dr. Smithson, S-m-i-t-h-s-o-n, who she saw.  She reported head and neck pain, and she reported swelling and facial pain.

Dr. Smithson then, according to Mrs. Ruff's history, prescribed a number of diagnostic tests, including CT scans of the head, MRI scans of the head and neck and other x-rays.  She told me that she did have those tests.  She told me that she was treated with medication for pain, also with physical therapy, based on the tests and her reported persistent symptoms of head and neck pain and headaches in spite of the medical treatments that were carried out, she was referred by her family physician, Dr. Smithson, to a neurologist for evaluation.  She did have additional diagnostic

1  tests.  She did have chiropractic therapy with

2  adjustments and manipulations.

3       She did tell me that she was continuing

4  to be treated by Dr. Smithson, by her chiropractor

5  at the time I saw her in June of 2010 for ongoing

6  head and neck symptoms and also anxiety and

7  depression-related symptoms.

8       Q.    Okay.  And just to put a time frame on

9  it, when you are performing your evaluation of

10  Mrs. Ruff, this is approximately six months after

11  the American Airlines accident, is that right?

12       A.    Well, that's correct.  The accident was

13  December 22nd of 2009.  I saw her June 3rd of 2010,

14  so it is about six months after the accident.

15       Q.    And when you performed your evaluation

16  of her, did she have any complaints at that time of

17  pain or other problems that she was still

18  experiencing?

19       A.    Yes, she did.  She had a number of

20  ongoing complaints, and I'll go through them for

21  you.  These are complaints that appear to have been

22  consistent with the complaints that she reported to

23  her treating physician for which the diagnostic

24  tests were carried out.  So just to briefly review

25  these for you.  She told me that she was still

1  having daily headaches.  She said that the

2  headaches were largely frontal so forehead-type

3  headaches.  The headaches went from the front from

4  the forehead region up through the top of her head.

5  She described the pain to me as aching.  She said

6  that there were occasional sharp pains as well as

7  the more dull aches.  She said that she was taking

8  medication, anti-inflammatory and pain medication.

9  She said that that did help, but she was still

10 having these daily headaches.  She told me that she

11 still had pain and stiffness in her neck, and she

12 said that that symptom was made worse by rotation

13 or bending of her neck.  For example, she told me

14 she had difficulty in driving, that would be

15 looking from side to side and also in sleeping.

16        She told me that she had some occasional

17 tingling of her hands, both sides.  She said that

18 that was made worse by hand use by gripping.  She

19 told me that she still had pain in her mid and

20 lower back.  She said that the pain was helped by

21 the chiropractic therapies, and then she told me

22 that she was still having significant anxiety by

23 her report to me.  She said that the anxiety

24 manifested itself by difficulty in sleeping and

25 what she described as flashbacks of the accident of

1    the plane and getting out of the plane.  She said

2    that she was now, again at the time I saw her,

3    particularly anxious about traveling anywhere.  So

4    these are the symptoms that Mrs. Ruff reported to

5    me in June of 2010.

6        **Q.    And, Dr. Coe, as part of your evaluation**

7    **of Mrs. Ruff, did you also ask her about any past**

8    **medical history she may have had that could have**

9    **contributed to any of the symptoms she was**

10   **experiencing?**

11       A.    I did.  Now, with her regarding past

12   medical history, I focused on the areas of the body

13   that were still causing symptoms so I didn't ask

14   her about every medical problem she had had

15   throughout her life.  I asked her about prior head

16   injuries, prior neck or back injuries, things that

17   she might have felt or experienced in these areas

18   of her body before December 22nd of 2009, and she

19   said that her history was negative.  She had had no

20   prior head, neck, or significant back injuries.  No

21   ongoing pain.  No daily headaches.  No severe

22   anxiety attacks.  No difficulty in traveling.  This

23   is what she reported to me.

24       **Q.    And, Dr. Coe, as someone who specializes**

25   **in occupational medicine, was it also part of your**

1  evaluation of Mrs. Ruff to discuss with her her

2  work history and how her injuries were impacting

3  her work, if at all?

4       A.    I did.  I mean, my specialty as you've

5  just said is occupational medicine.  It's

6  work-related medical problems so one of my areas of

7  expertise is what people do and how they do it,

8  whether they can go back to work, whether they need

9  modification or restriction.  So I did address this

10 problem with Mrs. Ruff.

11          She told me that she owned a small

12 business, a shop.  She said that she had had this

13 shop for about 11 years.  She said that she did

14 everything in this store.  She did sales, but she

15 also did the administrative or back office work,

16 including bookkeeping and recordkeeping.  She said

17 that before the accident, she frequently had worked

18 ten or more hours per day.  She said that after the

19 accident with the ongoing head, neck, and back

20 symptoms and other psychological-type complaints

21 that she was making, she was having difficulty at

22 her store.  She was having difficulty in customer

23 interactions.  She was having difficulty in

24 bookkeeping.  She was having difficulty in keeping

25 up the hours that she had previously worked.  She

15

1   said that she could no longer do the store by

2   herself.  She said that she had hired an assistant

3   for about 16 hours a week to help her out at the

4   store.  So this is the change in work activities,

5   in work practices that she reported to me.

6        Q.    **Did you also discuss with Mrs. Ruff her**

7   **outside of work activities, in other words, her**

8   **recreational activities?**

9        A.    I did.  We talked briefly about

10  recreational activities that she carried out.  She

11  said that she now had had difficulty carrying out

12  outside or recreational activities, and she said

13  that this was because of the head pain, and

14  particularly the stiffness and discomfort in her

15  neck and upper back that was causing difficulty in

16  bending and twisting her neck, standing for

17  prolonged periods of time, and other types of

18  movement.  So she said that because of this, she

19  had difficulty with gardening, which she had

20  enjoyed before the accident.  She had difficulty in

21  exercising and working out that she had also

22  carried out before the accident.  So these are some

23  of the changes in non-vocational activities that

24  she reported to me.

25       Q.    **And, Dr. Coe, as part of your evaluation**

16

1 of Mrs. Ruff, did you also perform a physical

2 examination of her at your offices there in

3 Chicago?

4       A.    Well, I did.  We then moved on to the

5 physical examination.  This is the next part of the

6 standard assessment.  The physical examination

7 included observations, that's looking at a person,

8 can you see scars, can you see deformity,

9 measurements, these are usually measurements of

10 sizes of abnormalities, measurements of ranges of

11 motion, and then more specific orthopedic or

12 neurological-type tests, looking for areas of nerve

13 root impingement, nerve pinching.  So these were

14 the general components of the physical examination

15 that I then carried out again focusing on Mrs.

16 Ruff's head, neck, and back and her upper

17 extremities, and I can describe that examination in

18 more detail for you.

19       Q.    One of the things you mention is that

20 you tested her range of motion.  Can you describe

21 for us what that means and what findings you had

22 when you tested Mrs. Ruff's range of motion?

23       A.    I'd be glad to.  Range of motion is what

24 it sounds like, it's asking a person to move

25 through first actively, that's where they move it

1  so I'm going to move my head to show you that's

2  just standard active range of motion.  And then

3  passively, that's where I push them further to see

4  how far I can move a person's joint, here, their

5  neck, or their lower back.  I measure this.  I

6  measure it using an instrument called a goniometer.

7  It's g-o-n-i-o-m-e-t-e-r.  A goniometer is like a

8  big compass that's used for this type of joint

9  motion measurement.  So this is what I carried out

10  when I looked at Mrs. Ruff's neck, and also when I

11  looked at her lower back (Demonstrating).

12      **Q.     Okay.  And what were the results of the**

13  **range of motion testing that you did on her neck**

14  **and lower back?**

15      A.     Well, I -- let me just summarize this

16  for you briefly, and then I'll give you the

17  numbers.

18          What I found was that she had mild to

19  moderate stiffness in both her neck and her lower

20  back.  So first with her neck, there are four types

21  of movements that are assessed in range of motion

22  measurements.  The first is flexion, that's a

23  person bringing their chin down to their chest, I

24  guess I'm demonstrating that for you as we do this.

25  So flexion is chin-to-chest motion.  I found that

Mrs. Ruff could flex her neck to 40 degrees, as I measured it.  Normal range of motion is stated to be 45 degrees.  The opposite movement is called extension.  That's a backwards bending.  Bending as if the person was going to look up at the ceiling. She could do that to 25 degrees.  Normal is 35 degrees.

The next movements are rotations so looking over to the right, looking over to the left.  She could do that to 45 degrees to the right, 50 degrees to the left.

Now, the end point of rotation is in normal populations 65 degrees, and then the next motion is lateral bending.  This is a bending where the patient brings their ear down to their shoulder on either side, and Mrs. Ruff could do that to 20 degrees on the right, 25 degrees on the left. Normal is 35 degrees.

So just again to summarize this, I would classify this as mild to moderate stiffness of Mrs. Ruff's neck in all the quadrants, in all the motions that were tested.  I then moved on to Mrs. Ruff's lower back for range of motion measurement.

Q.    Can you describe for us what your findings were when you did range of motion testing

1  on her lower back?

2      A.    Sure.  I'd be glad to.  It's the same

3  procedure that I've just described to you.  I

4  looked first at flexion.  In the lower back,

5  flexion is bending forward, like a person was going

6  to touch their toes, she could do that to

7  80 degrees.  Normal is 90 degrees.  Opposite of

8  bending forward is the extension or backwards

9  bending.  She could do that to 20 degrees.  Normal

10  is 35 degrees.  She could turn and bend to the

11  right.  This is the lateral side-to-side bending.

12  She could do that to 30 degrees to the right,

13  30 degrees to the left.  Normal is 40 degrees.  So

14  this is again mild to moderate stiffness of her

15  lower back, and both the movements of her upper and

16  lower back were associated with reported discomfort

17  in those areas of the body.

18      Q.    And during the course of your physical

19  examination, was there any other testing that you

20  did that indicated maybe where you had findings

21  that were consistent with the injuries Mrs. Ruff

22  reported to you?

23      A.    There were, and let me go through these

24  for you because they are really only a few

25  additional findings that I noted to be of

significance.  First, you'll recall that Mrs. Ruff
talked about a forehead contusion and forehead
swelling.  On her forehead in the area of the
junction between the nose and the eyebrow, there
was an area of slight hyperpigmentation.
Hyperpigmentation means a darkening of the skin
color.  This was at the contusion site.  There was
also still some tenderness to palpation.  I pushed.
She said it was tender.  This is in the area of the
right forehead just above her right eyebrow.  So
this is consistent with the description of the
accident that she gave to me.

Moving on, I found that there were
tender areas in Mrs. Ruff's neck, in the base of
her skull, and in her upper back.  These are called
trigger points, and just briefly, a trigger point
by definition is an area of tenderness about the
size of a fingertip.  So with trigger point
testing, I used my fingertip, and I pushed at the
base of her skull and in the neck muscles on either
side in the upper back muscles on either side.  I
found that there were several areas where she
reported specific localized point tenderness.

I want to make it clear, this is not a
complaint of her whole neck is hurting or her whole

back is hurting.  These are specific points locally identified points of tenderness.

A trigger point is a Hallmark of what's called myofascial pain.  This is pain arising from soft tissues.  Soft tissues in this area of the body are muscles, tendons, or ligaments, and these are the muscles and tendons and the ligaments that lie alongside of the neck on either side.  These are the muscles that attach to the base of the skull along that ridge along the back of your skull.  These are the muscles that go down into the mid back region.  So she had a number of these trigger points consistent with a diagnosis of myofascial pain or a myofascial pain syndrome.

I did find that there was a decrease in sensation on the first through third fingers flexor, that's the palm surface of Mrs. Ruff's left hand, that's in the distribution of the median nerve.  You'll recall or you know from her treatment medical records that she has an unrelated problem of carpal tunnel syndrome.  This was present.  This is not related to the accident.

With regard to the lower back, she also had some areas of tenderness.  So these are the principal findings on physical examination.  The

1    areas of change in the skin color on her forehead,

2    the tenderness in her forehead, the trigger points

3    in the soft tissues of her neck and back, the

4    decreased range of motion of her neck and decreased

5    range of motion of her lower back.  Those were the

6    principal findings on this examination in June

7    of 2010.

8         Q.    And, Dr. Coe, I'd like to turn now to

9    the conclusions that you reached as a result of

10   your evaluation of Monica Ruff.

11              Did you, in fact, reach any conclusions

12   as to whether or what type of injuries she had

13   suffered as a result of her involvement in the

14   accident in American Airlines Flight 331 on

15   December 22nd of 2009?

16        A.    I did.  I was able to draw and to reach

17   certain conclusions following this evaluation.

18   Based on the examination that I carried out, also

19   based on the other information that I had in this

20   case, and that includes that history from Mrs. Ruff

21   that I've described briefly to you here today, I

22   concluded that she had suffered multiple contusions

23   and also sprain/strain type injuries in the

24   airplane crash that she described to me and that

25   she was continuing to experience pain.  The types

of pain that she was experiencing were arising from her neck and back.  I categorized these as myofascial pain.  She also had some local or residual pain at the contusion site on that right side of her forehead above her eyebrow, and then in addition, she was having post traumatic headaches. These are the daily headaches.  This is a typical findings in someone with a closed head injury, and finally she was reporting symptoms to me that in her description were consistent with a post traumatic stress disorder.

        These are the problems with insomnia, with reliving of the events of the accident, what she described as flashbacks, anxiety about travel. So those were the conclusions that I drew in this matter.

    Q.    And, Dr. Coe, are those conclusions that you drew with a reasonable degree of medical certainty?

    A.    Yes.  All the conclusions that I've just described to you are to a reasonable degree of medical certainty based on the sources of information that I had in this matter that I have described for you.

    Q.    And, Dr. Coe, as a result of your

24

evaluation, did you also form any opinions as to
whether Mrs. Ruff continued to be in need of any
form of medical treatment as of June 3rd, 2010?

    A.    I did.  Based on the ongoing symptoms
that Mrs. Ruff reported to me, based on the
findings that I made when I examined her, based on
her psychological stress symptoms and complaints,
it was my opinion that she was still in need of
medical treatment.

        The medical treatment that I felt was
appropriate for her at that time was two-fold;
first, direct medical treatment.  This would be
treatment for ongoing pain.  The types of treatment
that she had been undergoing as prescribed by her
family physician, including medication and physical
therapies, including chiropractic therapy as a type
of physical therapy.

        Then the second treatment that I felt
was appropriate for her was psychological treatment
for her stress-related symptoms.  These are the
symptoms of anxiety with associated insomnia,
intrusive thoughts, and others.  I did feel that it
would be appropriate for her to undergo a more
complete neuropsychological evaluation.  That's
neuropsychological testing and interviewing, and

1  then based on the findings of that evaluation,

2  psychological treatments of an appropriate type

3  could be prescribed for her.  So those were the

4  recommendations that I would make for Mrs. Ruff.

5      MR. MINER:  Thank you, Dr. Coe.  Those are all

6  the questions I have for now.

7      THE WITNESS:  You're welcome.

8                    CROSS-EXAMINATION

9  BY MR. PALMER:

10     Q.    Hi, Doctor.  I represent the defendant

11  in this case.  I'm going to ask you just a few

12  follow-up questions.

13     A.    Sure, Greg, of course.

14     Q.    Now, the manner in which you saw Mrs.

15  Ruff, she was a referral from her attorney?

16     A.    Yes, Greg.  That's correct.  She was

17  referred to me by her attorney in this matter.

18     Q.    Now you're in Chicago and you're aware

19  that Mrs. Ruff is not from Illinois, correct?

20     A.    Oh, yes, I'm quite aware of that.  Mrs.

21  Ruff is from Missouri.  I'm here in Chicago.  That

22  is correct.

23     Q.    So Mrs. Ruff traveled to see you from

24  Missouri to Chicago, correct?

25     A.    Yes, she did.

26

Q.     Okay.  And now for this service of providing an examination of Mrs. Ruff, you sent a bill, did you not?

A.     Oh, yes, I charged for this service for carrying out the examination, for writing a report, and so I did charge for that service.  There was a bill for that service, that is correct.

Q.     And the bill went to the attorney who referred Mrs. Ruff to you, correct?

A.     Yes.  That's correct.

Q.     And that bill was for $1,400, correct?

A.     All together, yes, that's correct.

Q.     Okay.  Now, a couple of the areas I want to ask you about is first regarding past medical history.  Now she denied a prior medical history of low back pain, correct?

A.     That's correct.

Q.     And denied a past medical history of any -- and I've got in my notes, anxiety-related symptoms, correct?

A.     Anything of significance.  And I defined this for her.  Just to be clear for you, I defined significant as things that would require medical treatment beyond over-the-counter type medication or simple therapies, but yes, that is correct.

1    Q.    All right.  So if you were to learn that

2    Mrs. Ruff was, in fact, complaining to other

3    doctors of items such as back pain or neck pain,

4    those may have a bearing on your opinions

5    pertaining to the cause of her current symptoms as

6    it relates to the incident of December of 2009,

7    correct?

8         A.    I mean, yes.  That's --

9         MR. MINER:  Objection to form.

10   BY THE WITNESS:

11        A.    That certainly is --

12        MR. MINER:  I said objection to the form.

13             You can answer it.

14   BY THE WITNESS:

15        A.    Okay.  Yes.  That certainly is a

16   possibility depending upon what the additional

17   information is and its significance to me in

18   evaluation.

19   BY MR. PALMER:

20        Q.    All right.  And, in fact, her denial of

21   lower back pain, for instance, if, in fact, she did

22   complain of it to other doctors prior to the time

23   of seeing you is something which is very important

24   when trying to place relative work on her history

25   to you, correct?

1      A.    It's something --

2      MR. MINER:  Objection to form.

3  BY THE WITNESS:

4      A.    It's something that I would want to

5  consider.  So if there is additional information, I

6  would want to know what that information is to help

7  me more fully shape my conclusions and opinions in

8  a matter like this.

9  BY MR. PALMER:

10     Q.    Right.  Now, you saw her on the one

11 occasion in 2010, correct?

12     A.    Yes.  That's correct.

13     Q.    And you haven't seen her.  It's now

14 September of 2012, so you haven't seen her in over

15 two years, correct?

16     A.    Yes.  That's also correct.

17     Q.    Now, during your physical examination

18 back in 2010, you noted that she was walking

19 without any limp or gait abnormality, correct?

20     A.    Yes, I'm just looking back through my

21 notes, but I believe that that is correct.  I did

22 not describe -- I did not observe Mrs. Ruff to walk

23 with a gait abnormality.  She walked here in the

24 corridor of my office.  It's about 30 feet up and

25 back, so that is correct.

29

       Q.     Okay.   And then when you examined her

head, you were able to determine that her eye

movements and pupil responses were intact, right?

       A.     Yes.   That's correct.   I was looking for

cranial nerve abnormalities.   There were none that

I saw on that date.

       Q.     All right.   And you also evaluated the

muscle strength of her eyelids, facial muscles,

correct?

       A.     Yes.   That's correct.

       Q.     They were intact and symmetrical?

       A.     They were.   She appeared to have full

strength of her facial muscles.

       Q.     Regarding palpation into her cervical

spine, you found no areas of generalized tenderness

or muscle spasm, correct?

       A.     Yes.   That's correct, and that was of

importance to me.   I was looking for some sign that

there might be, for example, some type of

exaggeration or symptom magnification, and that's

often seen in a person who says everything hurts.

Every place that you touch hurts.   That was not the

case in Mrs. Ruff.   It was not generalized

tenderness, again as I've described for you, the

only tenderness that I found were those --

1    Q.    You found no muscle spasms and that's

2  significant, right?

3    A.    Yes, I'm sorry, that's correct, Greg.

4  There were no muscle spasms, and that was of

5  significance to me.

6    Q.    All right.  Now, when you measured the

7  circumference of her upper extremities, those were

8  found to be symmetrical?

9    A.    They were.  They were the same on both

10  sides.  That's a normal finding.

11    Q.    And again, with the muscle strength

12  would be symmetrical?

13    A.    Yes, it was, and in both of her arms and

14  also in her legs.

15    Q.    Now you examined her lower back and

16  again found no areas of tenderness and again found

17  no muscle spasm in her lower back, correct?

18    A.    Yes.  That's correct.

19    Q.    Her deep tendon reflexes were

20  symmetrical and normal?

21    A.    Yes, they were, and that is a normal

22  finding.

23    Q.    And again, her muscle strength in the

24  lower extremities to be intact and symmetrical?

25    A.    It was.

        Q.      Again, a good finding?

        A.      Yeah.  I mean, these are all the normal

findings so that is correct.  I mean, there were

abnormal findings, but these are all normal

findings.

        Q.      Now, regarding tests that were performed

as far as the CT scan and MRI scans, you did not

read those scans yourself, correct?

        A.      No, I did not have the reports of those

scans or the films themselves for review so I had

no specific information about the findings of those

tests other than what Mrs. Ruff told me.

        Q.      Okay.  All right.  Well, Mrs. Ruff when

she saw you told you that she might have suffered a

skull fracture, correct?

        A.      It was either a skull fracture or more

specifically a fracture of the facial bones, but

that's what she told me.

        Q.      Okay.  And you're aware in your report

and you noted on Page 2 that according to the CT

report, it was interpreted as showing no focal

abnormalities, correct?

        A.      Yes, that's as I described, that is

correct.

        Q.      And the MRI scan of the cervical spine,

32

1    again you didn't read that yourself?

2         A.    No, I did not.

3         Q.    And you -- I don't see a reference in

4    your report as to the findings of that study.

5         A.    That's correct.  I don't know the

6    findings of the study.

7         Q.    All right.  Now, after the June 3rd,

8    2010, report that you authored, have you made any

9    effort or has anyone contacted you to see Mrs. Ruff

10   for a follow-up examination?

11        A.    No, there's been no follow-up

12   examination that I've carried out.  No one has

13   contacted me to arrange for a reexamination of

14   Mrs. Ruff.

15        Q.    Okay.  And they had -- had someone done

16   so, would you have agreed to see Mrs. Ruff on such

17   one occasion?

18        A.    Oh, sure.  I mean, I would have been

19   glad to see her again.  I mean, she'd have to come

20   to Chicago again, but I would have been glad to

21   look at her for a reexamination.

22        MR. PALMER:  Okay.  Doctor, I don't have any

23   other questions for you.

24

25

33

```
 1                    REDIRECT EXAMINATION
 2   BY MR. MINER:
 3       Q.    Dr. Coe, I just had a couple of quick
 4   follow-up questions for you.
 5              As someone who specializes in
 6   occupational medicine, is it ordinary for you to
 7   see patients who have been in accidents?
 8       A.    It's -- yes, it is.  It's one of the
 9   customary activities that I carry out.  Doing
10   evaluations, having to do with people injured at
11   work, undergoing accidents at work, it's about a
12   third of what I do in any work week or work month
13   or year so I do this on a routine basis.
14       Q.    Okay.  And then, Dr. Coe, is there
15   anything unusual about you seeing a patient who's
16   been in an accident and may have an insurance claim
17   or a lawsuit arising out of that accident?
18       A.    No.  I mean, I'm in occupational
19   medicine so almost everybody that I see here at the
20   office for both examination, evaluation, and
21   treatment has potentially, at least, some type of
22   claim or lawsuit usually through Worker's
23   Compensation or some other program.  So this is a
24   commonplace for me.
25              MR. MINER:  Okay.  Thank you for your time
```

34

```
1    this morning, Dr. Coe.  That's all the questions I

2    have about Mrs. Ruff's case.

3         THE WITNESS:  You're welcome.

4         MR. PALMER:  Okay.  Thank you.

5         THE WITNESS:  You're welcome.

6         MR. PALMER:  Go off the record.  Now we have

7    the second one to do now.

8         THE VIDEOGRAPHER:  We are off the record at

9    11:17 a.m.  This concludes --

10        MR. MINER:  How do you want to do it?  You

11   want to take a -- I think technically it wasn't

12   noticed until --

13        THE VIDEOGRAPHER:  Counsel, hold on one

14   second, please.

15        MR. MINER:  Do you want to just take a quick

16   break and do it now?

17        THE REPORTER:  Could you wait one second while

18   we go off the record?

19        THE VIDEOGRAPHER:  Counsel, please hold on one

20   second.

21             We are off the record at 11:18 a.m.

22   This concludes the videotaped deposition of Jeffrey

23   Coe, M.D., Ph.D.

24             FURTHER DEPONENT SAITH NOT.

25
```

```
1    STATE OF ILLINOIS    )

2                         )   SS:

3    COUNTY OF C O O K    )

4              I, CATRICE M. PRINCE, CSR No. 84-003765,

5    a Notary Public within and for the County of Cook,

6    State of Illinois, and a Certified Shorthand

7    Reporter of said state, do hereby certify:

8              That previous to the commencement of the

9    examination of the witness, the witness was duly

10   sworn to testify the whole truth concerning the

11   matters herein;

12             That the foregoing deposition transcript

13   was reported stenographically by me, was thereafter

14   reduced to typewriting under my personal direction

15   and constitutes a true record of the testimony

16   given and the proceedings had;

17             That the said deposition was taken

18   before me at the time and place specified;

19             That I am not a relative or employee or

20   attorney or counsel, nor a relative or employee of

21   such attorney or counsel for any of the parties

22   hereto, nor interested directly or indirectly in

23   the outcome of this action.

24

25
```

1          IN WITNESS WHEREOF, I do hereunto set my

2   hand of office at Chicago, Illinois, this 26th day

3   of September, 2012.

4

5

6

7

8          Notary Public, Cook County, Illinois.

9          My commission expires 3/06/2013.

10

11   CATRICE M. PRINCE, CSR No. 84-003765

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**A**

able 8:25 9:8
 22:16 29:2
abnormal 31:4
abnormalities
 16:10 29:5 31:22
abnormality 28:19
 28:23
accident 8:8,17,22
 8:25 10:6 11:11
 11:12,14 12:25
 14:17,19 15:20
 15:22 20:12
 21:22 22:14
 23:13 33:16,17
accidents 33:7,11
aches 9:17 12:7
aching 12:5
action 35:23
active 17:2
actively 16:25
activities 15:4,7
 15:8,10,12,23
 33:9
addition 23:6
additional 9:23
 10:25 19:25
 27:16 28:5
address 14:9
adjustments 11:2
administrative
 14:15
advising 7:8
agreed 32:16
airlines 1:4 2:20
 4:13,20 8:24
 11:11 22:14
airplane 8:24
 22:24
alhambra 2:5
alongside 21:8
american 1:4 2:20
 4:13,20 8:24
 11:11 22:14
answer 27:13
anthony 4:1
antiinflammatory
 12:8
anxiety 11:6 12:22
 12:23 13:22
 23:14 24:21
anxietyrelated
 26:19
anxious 13:3
appear 11:21
appeared 2:9,19
 29:12

**B**

b 2:8
back 5:23 10:9
 12:20 13:16,20
 14:8,15,19 15:15
 16:16 17:5,11,14
 17:20 18:23 19:1
 19:4,15,16 20:15
 20:21 21:1,10,12
 21:23 22:3,5
 23:2 26:16 27:3
 27:21 28:18,20
 28:25 30:15,17
background 5:16
backwards 18:4
 19:8
bang 9:2
base 20:14,20 21:9
based 8:21 10:20
 22:18,19 23:22
 24:4,5,6 25:1
basis 33:13
bayview 2:14

appropriate 24:11
 24:19,23 25:2
approximately
 11:10
area 9:16 20:3,5,9
 20:17 21:5
areas 6:12 13:12
 13:17 14:6 16:12
 19:17 20:14,22
 21:24 22:1 26:13
 29:15 30:16
arising 6:14 21:4
 23:1 33:17
arms 30:13
arrange 32:13
asked 13:15
asking 16:24
assessed 17:21
assessment 6:18
 16:6
assistant 15:2
assisted 9:7,11
associated 6:24,25
 19:16 24:21
associates 7:3
attach 21:9
attacks 13:22
attorney 25:15,17
 26:8 35:20,21
attorneys 4:15
authored 32:8
aviation 9:6
aware 25:18,20
 31:19

beach 9:10
bearing 27:4
behalf 2:9,19 4:9
 4:17,19
believe 28:21
bend 19:10
bending 12:13
 15:16 18:4,4,14
 18:14 19:5,8,9
 19:11
beyond 26:24
big 17:8
bill 26:3,7,8,11
bit 5:15
bleeding 9:16
board 6:1,8
bobby 2:10
body 13:12,18
 19:17 21:6
bones 31:17
bookkeeping 14:16
 14:24
break 34:16
brickell 2:14
briefly 8:19 10:8
 11:24 15:9 17:16
 20:16 22:21
bringing 17:23
brings 18:15
broken 9:8
business 14:12

**C**

c 35:3
caldwell 2:13
called 1:8 5:2 7:2
 17:6 18:3 20:15
 21:4
camera 4:3
captioned 4:12
carpal 21:21
carried 7:12 9:19
 10:23 11:24
 15:10,22 16:15
 17:9 22:18 32:12
carry 7:7 8:12
 33:9
carrying 15:11
 26:5
case 1:5 4:12,13
 5:11 22:20 25:11
 29:23 34:2
categorized 23:2
catrice 1:11 2:24
 4:22 35:4 36:11
causation 6:15
cause 27:5
causing 13:13

 15:15
ceiling 18:5
centre 2:14
certain 22:17
certainly 27:11,15
certainty 23:19,22
certifiable 6:9
certified 1:14 6:1
 35:6
certify 35:7
cervical 29:14
 31:25
change 15:4 22:1
changes 15:23
charge 26:6
charged 26:4
chest 17:23
chicago 1:15 4:11
 5:18,19 7:3,4
 16:3 25:18,21,24
 32:20 36:2
chin 17:23
chintochest 17:25
chiropractic 11:1
 12:21 24:16
chiropractor 11:4
circle 2:5
circumference 30:7
civil 1:9 4:9
claim 33:16,22
classify 18:20
clear 20:24 26:22
client 7:10
closed 23:8
coe 1:8 3:3 4:8
 5:1,8,8,9 6:4,23
 13:6,24 15:25
 22:8 23:17,25
 25:5 33:3,14
 34:1,23
color 20:7 22:1
colson 2:4
come 32:19
commencement 35:8
commencing 1:17
commission 36:9
commonplace 33:24
compass 17:8
compensation 33:23
complain 27:22
complaining 27:2
complaint 20:25
complaints 11:16
 11:20,21,22
 14:20 24:7
complete 24:24
components 16:14
concerning 35:10

concluded 22:22
concludes 34:9,22
conclusions 22:9
  22:11,17 23:15
  23:17,20 28:7
condition 7:21 8:3
consider 28:5
consistent 11:22
  19:21 20:11
  21:13 23:10
constitutes 35:15
consulted 10:10
consulting 7:8
contacted 32:9,13
continued 24:2
continuing 11:3
  22:25
continuously 6:2
contributed 13:9
contusion 20:2,7
  23:4
contusions 22:22
cook 1:13 35:5
  36:8
coral 2:6
correct 7:16,24,25
  11:12 25:16,19
  25:22,24 26:7,9
  26:10,11,12,16
  26:17,20,25 27:7
  27:25 28:11,12
  28:15,16,19,21
  28:25 29:4,9,10
  29:16,17 30:3,17
  30:18 31:3,8,15
  31:22,24 32:5
corridor 28:24
counsel 34:13,19
  35:20,21
county 1:13 35:3,5
  36:8
couple 26:13 33:3
course 19:18 25:13
court 1:1 4:21
courts 1:10
cranial 29:5
crash 22:24
cross 3:5
crossexamination
  25:8
csr 1:12 2:24,25
  35:4 36:11
ct 10:16 31:7,20
current 5:21 27:5
curtis 2:8 4:17
  5:10
customary 8:10
  33:9

customer 14:22

D

d 1:8,8 3:1,3,3
  4:8,8 5:1,1,23
  34:23,23
daily 12:1,10
  13:21 23:7
darkening 20:6
date 29:6
day 1:16 14:18
  36:2
deals 6:11
december 8:23
  11:13 13:18
  22:15 27:6
decrease 21:15
decreased 22:4,4
deep 30:19
defendant 1:6 2:20
  4:20 25:10
defined 26:21,22
definition 20:17
deformity 16:8
degree 5:18,24
  23:18,21
degrees 18:1,3,6,7
  18:10,11,13,17
  18:17,18 19:7,7
  19:9,10,12,13,13
demonstrating
  17:11,24
denial 27:20
denied 26:15,18
depending 27:16
deponent 34:24
deposition 1:7 4:7
  7:5 34:22 35:12
  35:17
depositions 1:11
depressionrelated
  11:7
describe 16:17,20
  18:24 28:22
described 9:4,6
  12:5,25 19:3
  22:21,24 23:14
  23:21,24 29:24
  31:23
description 6:5
  20:11 23:10
detail 8:15 16:18
determine 29:2
diagnosis 6:15
  21:13
diagnostic 10:15
  10:25 11:23
didnt 13:13 32:1

difficulty 12:14
  12:24 13:22
  14:21,22,23,24
  15:11,15,19,20
direct 3:4 5:4
  24:12
direction 35:14
directly 35:22
disability 6:18
discomfort 9:17
  15:14 19:16
discuss 14:1 15:6
discussed 10:7
disorder 23:11
distribution 21:18
district 1:1,2,10
division 1:3
doctor 4:23 5:6,17
  25:10 32:22
doctors 27:3,22
doing 33:9
dont 8:14 32:3,5
  32:22
dr 5:9 6:4,23
  10:11,14,24 11:4
  13:6,24 15:25
  22:8 23:17,25
  25:5 33:3,14
  34:1
draw 22:16
drew 23:15,18
driving 12:14
dull 12:7
duly 4:24 5:2 35:9

E

e 1:8 3:1 5:1
ear 18:15
educational 5:16
effort 32:9
eidson 2:4
either 18:16 20:20
  20:21 21:8 31:16
emergency 9:19
employee 35:19,20
england 5:25
enjoyed 15:20
essentially 7:21
evaluate 7:20
evaluated 29:7
evaluation 5:13
  8:2,5 10:25 11:9
  11:15 13:6 14:1
  15:25 22:10,17
  24:1,24 25:1
  27:18 33:20
evaluations 33:10
events 23:13

everybody 33:19
evidence 1:7
exaggeration 29:20
examination 1:8
  3:3 5:4 7:12
  8:12 16:2,5,6,14
  16:17 19:19
  21:25 22:6,18
  26:2,5 28:17
  32:10,12 33:1,20
  35:9
examinations 7:7
examined 5:3 9:13
  24:6 29:1 30:15
example 12:13
  29:19
exercising 15:21
exhibits 3:9
exit 8:25 9:8
experience 8:7
  22:25
experienced 10:1
  13:17
experiencing 9:14
  11:18 13:10 23:1
expertise 6:12
  14:7
expires 36:9
extension 18:4
  19:8
extremities 16:17
  30:7,24
eye 29:2
eyebrow 20:4,10
  23:5
eyelids 29:8

F

face 9:16
facial 10:13 29:8
  29:13 31:17
facility 9:13
fact 22:11 27:2,20
  27:21
family 10:10,24
  24:15
far 10:4 17:4 31:7
federal 1:9 4:9
feel 24:22
feet 28:24
felt 10:1 13:17
  24:10,18
field 6:2
films 31:10
finally 23:9
find 8:2 21:15
finding 30:10,22
  31:1

findings 16:21
  18:25 19:20,25
  21:25 22:6 23:8
  24:6 25:1 31:3,4
  31:5,11 32:4,6
fingers 21:16
fingertip 20:18,19
first 5:2,6,14,20
  7:14,17 16:25
  17:20,22 19:4
  20:1 21:16 24:12
  26:14
flashbacks 12:25
  23:14
flex 18:1
flexion 17:22,25
  19:4,5
flexor 21:17
flight 1:5 8:24
  22:14
florida 1:2 2:6,16
focal 31:21
focused 13:12
focusing 16:15
following 6:18
  22:17
follows 5:3
followup 25:12
  32:10,11 33:4
foregoing 35:12
forehead 9:17 12:4
  20:2,2,3,10 22:1
  22:2 23:5
foreheadtype 12:2
form 24:1,3 27:9
  27:12 28:2
forward 19:5,8
found 17:18,25
  20:13,22 29:15
  29:25 30:1,8,16
  30:16
four 17:20
fracture 31:15,16
  31:17
frame 11:8
frequently 14:17
front 12:3
frontal 12:2
fuel 9:6
full 29:12
fully 28:7
further 17:3 34:24
fuselage 9:9

                G
gables 2:6
gait 28:19,23
gardening 15:19

general 6:19 8:6
  9:24 16:14
generalized 29:15
  29:23
getting 13:1
give 6:4 8:16
  17:16
given 35:16
glad 6:6 8:19
  16:23 19:2 32:19
  32:20
go 8:14 11:20 14:8
  19:23 21:11 34:6
  34:18
going 5:11 17:1
  18:5 19:5 25:11
goniometer 17:6,7
  17:7
good 5:6 31:1
graduate 5:23
great 8:15
greg 4:19 25:13,16
  30:3
gregory 2:18
gripping 12:18
guess 17:24

                H
hallmark 21:3
hand 12:18 21:18
  36:2
hands 12:17
happened 9:25
havent 28:13,14
head 9:18 10:12,16
  10:17,21 11:6
  12:4 13:15,20
  14:19 15:13
  16:16 17:1 23:8
  29:2
headaches 10:22
  12:1,2,3,3,10
  13:21 23:6,7
health 6:11,20
heard 9:2
help 12:9 15:3
  28:6
helped 12:20
helpful 6:7
hereto 35:22
hereunto 36:1
hi 25:10
hicks 2:4
hired 15:2
history 8:7,10,13
  8:15,16 9:24
  10:3,15 13:8,12
  13:19 14:2 22:20

26:15,15,18
  27:24
hold 34:13,19
home 9:23 10:3
hours 14:18,25
  15:3
hurting 20:25 21:1
hurts 29:21,22
husband 9:7
hyperpigmentation
  20:5,6

                I
id 5:14 6:6 8:19
  16:23 19:2 22:8
identification 3:9
identified 21:2
identify 4:15
ill 11:20 17:16
illinois 1:13,16
  4:11 25:19 35:1
  35:6 36:2,8
illnesses 6:14,19
im 5:11,17 7:4
  17:1,24 25:11,20
  25:21 28:20 30:3
  33:18
impacting 14:2
impingement 16:13
importance 29:18
important 27:23
incident 27:6
included 16:7
includes 6:5 22:20
including 10:16
  14:16 24:15,16
indicated 4:6
  19:20
indirectly 35:22
information 22:19
  23:23 27:17 28:5
  28:6 31:11
initially 10:1
injured 33:10
injuries 6:14,17
  6:18 10:5 13:16
  13:16,20 14:2
  19:21 22:12,23
injury 23:8
insomnia 23:12
  24:21
instance 27:21
instrument 17:6
insurance 33:16
intact 29:3,11
  30:24
interactions 14:23
interested 35:22

internship 5:20
interpreted 31:21
interviewing 24:25
intrusive 24:22
involved 8:22
involvement 22:13
issues 6:19 8:12
items 27:3
ive 6:2 7:1 19:3
  22:21 23:20
  26:19 29:24
  32:12

                J
jamaica 9:10,21
jeffrey 1:7 3:3
  4:8 5:1,8 34:22
joint 17:4,8
junction 20:4
june 7:12,14,17
  8:4,21 11:5,13
  13:5 22:6 24:3
  32:7

                K
k 35:3
keeping 14:24
kingston 9:10,14
  9:19
kirk 2:13
know 5:9,14 21:19
  28:6 32:5

                L
largely 12:2
lateral 18:14
  19:11
lawsuit 33:17,22
learn 27:1
lee 2:10
left 18:10,11,17
  19:13 21:17
legal 4:2,22
legs 30:14
lenard 4:14
lie 21:8
life 13:15
ligaments 21:6,7
lights 9:5
limp 28:19
little 5:14
local 9:12,18 23:3
localized 20:23
locally 21:1
located 7:3
london 5:25,25
longer 15:1
look 18:5 32:21

looked 17:10,11
  19:4
looking 12:15 16:7
  16:12 18:9,9
  28:20 29:4,18
lot 6:19
low 26:16
lower 12:20 17:5
  17:11,14,19
  18:23 19:1,4,15
  19:16 21:23 22:5
  27:21 30:15,17
  30:24

---

**M**

m 1:8,11,17 2:18
  2:24 3:3 4:5,8
  5:1 34:9,21,23
  35:4 36:11
magnification
  29:20
making 14:21
manifested 12:24
manipulations 11:2
manner 25:14
marked 3:9
matter 23:16,23
  25:17 28:8
matters 35:11
mean 14:4 27:8
  31:2,3 32:18,19
  33:18
means 16:21 20:6
measure 17:5,6
measured 18:2 30:6
measurement 17:9
  18:23
measurements 16:9
  16:9,10 17:22
median 21:18
medical 5:18,19
  6:7,9,24 7:2,23
  9:13,23 10:3,22
  13:8,12,14 14:6
  21:20 23:18,22
  24:3,9,10,12
  26:14,15,18,23
medication 10:19
  12:8,8 24:15
  26:24
medicine 5:17,22
  5:24 6:3,5,10,11
  6:13,22 7:3
  13:25 14:5 33:6
  33:19
meeting 7:20
memory 9:3
mention 16:19

met 7:15,18
miami 1:3 2:16
micheletto 4:1
mid 12:19 21:12
mild 17:18 18:20
  19:14
miner 2:8 3:4,6
  4:17,17 5:5,10
  25:5 27:9,12
  28:2 33:2,25
  34:10,15
missouri 9:23 10:4
  10:9 25:21,24
moderate 17:19
  18:20 19:14
modification 14:9
monica 2:11 4:12
  4:18 5:11 7:10
  7:11,15 8:17
  22:10
month 33:12
months 11:10,14
morgan 1:15 4:10
morning 5:6,12
  34:1
motion 16:11,20,22
  16:23 17:2,9,13
  17:21,25 18:2,14
  18:23,25 22:4,5
motions 18:22
move 16:24,25 17:1
  17:4
moved 16:4 18:22
movement 15:18
  18:3
movements 17:21
  18:8 19:15 29:3
moving 20:13
mri 10:16 31:7,25
multiple 22:22
muscle 29:8,16
  30:1,4,11,17,23
muscles 20:20,21
  21:6,7,9,11 29:8
  29:13
myofascial 21:4,14
  21:14 23:3

---

**N**

n 3:1
name 5:7,9
neck 9:18 10:12,17
  10:21 11:6 12:11
  12:13 13:16,20
  14:19 15:15,16
  16:16 17:5,10,13
  17:19,20 18:1,21
  20:14,20,25 21:8

22:3,4 23:2 27:3
need 8:14 14:8
  24:2,8
negative 13:19
nerve 16:12,13
  21:19 29:5
neurologicaltype
  16:12
neurologist 10:24
neuropsycholog...
  24:24,25
nonvocational
  15:23
normal 18:2,6,13
  18:18 19:7,9,13
  30:10,20,21 31:2
  31:4
north 1:15 4:10
nose 20:4
notary 1:12 35:5
  36:8
noted 19:25 28:18
  31:20
notes 26:19 28:21
noticed 34:12
number 10:15 11:19
  21:12
numbers 17:17

---

**O**

o 35:3,3
objection 27:9,12
  28:2
observations 16:7
observe 28:22
obtain 10:2
obtained 8:17
occasion 28:11
  32:17
occasional 12:6,16
occupational 5:22
  5:24 6:3,5,10,13
  6:21 7:2 13:25
  14:5 33:6,18
office 6:25 7:9,17
  14:15 28:24
  33:20 36:2
offices 16:2
oh 25:20 26:4
  32:18
okay 7:9,13,19 8:5
  8:14 10:2 11:8
  17:12 26:1,13
  27:15 29:1 31:13
  31:19 32:15,22
  33:14,25 34:4
ongoing 7:22 11:5
  11:20 13:21

14:19 24:4,13
operator 4:2
opinion 24:8
opinions 24:1 27:4
  28:7
opposed 7:22
opposite 18:3 19:7
ordinary 33:6
orthopedic 16:11
outcome 35:23
outside 15:7,12
overthecounter
  26:24
overview 8:16
owned 14:11

---

**P**

page 31:20
pain 10:12,13,19
  10:21 11:17 12:5
  12:8,11,19,20
  13:21 15:13 21:4
  21:4,14,14 22:25
  23:1,3,4 24:3
  26:16 27:3,3,21
pains 9:17 12:6
palm 21:17
palmer 2:18 3:5
  4:19,19 25:9
  27:19 28:9 32:22
  34:4,6
palpation 20:8
  29:14
part 8:5 13:6,25
  15:25 16:5
particular 6:23
particularly 13:3
  15:14
parties 35:21
passenger 8:23
passively 17:3
patient 8:6,11
  18:15 33:15
patients 7:6 33:7
pediatrics 5:21
penthouse 2:5
people 6:8,12 14:7
  33:10
perform 16:1
performed 11:15
  31:6
performing 11:9
periods 15:17
persistent 10:21
person 16:7,24
  17:23 18:5 19:5
  29:21
personal 35:14

persons 17:4
pertaining 1:10
 27:5
ph 1:8 3:3 4:8 5:1
 5:23 34:23
physical 7:7 8:12
 10:20 16:1,5,6
 16:14 19:18
 21:25 24:15,17
 28:17
physician 8:1
 10:10,24 11:23
 24:15
physicians 9:19,20
picked 9:12
pinching 16:13
place 27:24 29:22
 35:18
plaintiff 4:18
 5:10
plaintiffs 2:10
 4:10
plane 9:1,8 13:1,1
please 4:15,22 5:7
 34:14,19
point 7:22 8:3
 9:12 18:12 20:16
 20:18,23 21:3
points 20:16 21:1
 21:2,13 22:2
populations 18:13
possibility 27:16
post 23:6,10
potentially 33:21
practice 6:24 7:2
 7:6 8:10
practices 15:5
prescribed 10:15
 24:14 25:3
present 2:1 21:22
previous 35:8
previously 14:25
prince 1:12 2:24
 4:22 35:4 36:11
principal 21:25
 22:6
prior 13:15,16,20
 26:15 27:22
problem 13:14
 14:10 21:21
problems 11:17
 14:6 23:12
procedure 1:9 4:9
 8:9 19:3
proceedings 35:16
program 33:23
prolonged 15:17
providing 26:2

psychological 24:7
 24:19 25:2
psychologicaltype
 14:20
public 1:12 35:5
 36:8
pupil 29:3
purpose 7:20 8:2
pursuant 1:9 4:8
push 17:3
pushed 20:8,19
put 11:8

Q
quadrants 18:21
questions 5:12
 6:17 8:11 25:6
 25:12 32:23 33:4
 34:1
quick 33:3 34:15
quite 25:20

R
range 16:20,22,23
 17:2,13,21 18:2
 18:23,25 22:4,5
ranges 16:10
reach 22:11,16
reached 22:9
read 31:8 32:1
really 19:24
reasonable 23:18
 23:21
recall 20:1 21:19
received 5:17,23
 10:5
recommendations
 25:4
record 4:4,16 34:6
 34:8,18,21 35:15
recordkeeping
 14:16
records 21:20
recreational 15:8
 15:10,12
redirect 3:6 33:1
reduced 35:14
reexamination
 32:13,21
reference 32:3
referral 25:15
referred 10:23
 25:17 26:9
reflexes 30:19
regard 21:23
regarding 8:17
 13:11 26:14
 29:14 31:6

region 12:4 21:12
rehabilitation
 6:16
related 8:11 21:22
relates 27:6
relating 6:17,20
relationship 7:23
relative 27:24
 35:19,20
reliving 23:13
report 12:23 26:5
 31:19,21 32:4,8
reported 2:24
 10:12,12,21
 11:22 13:4,23
 15:5,24 19:16,22
 20:23 24:5 35:13
reporter 1:14 4:21
 34:17 35:7
reporting 23:9
reports 31:9
represent 5:10
 25:10
representing 4:2
require 26:23
residency 5:20
residual 23:4
responses 29:3
restriction 14:9
result 22:9,13
 23:25
results 17:12
return 6:16
returned 9:22 10:3
review 11:24 31:10
ridge 21:10
right 11:11 18:9
 18:11,17 19:11
 19:12 20:10,10
 23:4 27:1,20
 28:10 29:3,7
 30:2,6 31:13
 32:7
root 16:13
rotation 12:12
 18:12
rotations 18:8
roughly 9:20
routine 33:13
ruff 2:10,11 4:12
 4:18 5:11,13
 7:10,15 8:13,17
 8:21 10:8 11:10
 13:4,7 14:1,10
 15:6 16:1 18:1
 18:16 19:21 20:1
 22:10,20 24:2,5
 25:4,15,19,21,23

26:2,9 27:2
 28:22 29:23
 31:12,13 32:9,14
 32:16
ruffs 10:15 16:16
 16:22 17:10
 18:21,23 20:14
 21:17 34:2
rules 1:9 4:9
rumberger 2:13

S
s 4:2,22
safety 6:20
saith 34:24
sales 14:14
saw 7:9 8:2 9:20
 10:11 11:5,13
 13:2 25:14 28:10
 29:6 31:14
says 29:21
scan 31:7,25
scans 10:16,16
 31:7,8,10
scars 16:8
school 5:19,23
screen 4:6
seat 9:4
second 24:18 34:7
 34:14,17,20
see 7:6 16:8,8
 17:3 25:23 32:3
 32:9,16,19 33:7
 33:19
seeing 27:23 33:15
seen 28:13,14
 29:21
sensation 21:16
sent 26:2
september 1:16 4:5
 28:14 36:3
service 26:1,4,6,7
set 36:1
severe 13:21
shape 28:7
sharp 12:6
shed 32:19
shop 14:12,13
shorthand 1:14
 35:6
shoulder 18:15
show 17:1
showing 31:21
side 12:15,15
 18:16 20:21,21
 21:8 23:5
sides 12:17 30:10
sidetoside 19:11

sign 29:18
significance 20:1
  26:21 27:17 30:5
significant 12:22
  13:20 26:23 30:2
simple 26:25
site 20:7 23:4
sitting 7:4
six 11:10,14
size 20:18
sizes 16:10
skin 20:6 22:1
skull 20:15,20
  21:10,11 31:15
  31:16
sleeping 12:15,24
slight 20:5
small 14:11
smelled 9:6
smithson 10:11,11
  10:14,24 11:4
soft 21:5,5 22:3
somewhat 6:7
sorry 30:3
sort 8:7 10:4
sounds 16:24
sources 23:22
southern 1:2
southwest 2:15
spasm 29:16 30:17
spasms 30:1,4
special 6:12
specialist 6:1,13
specializes 13:24
  33:5
specialty 5:22 6:8
  6:9,10,21 14:4
specific 16:11
  20:23 21:1 31:11
specifically 31:17
specified 35:18
spine 29:15 31:25
spite 10:22
sprain 22:23
ss 35:2
standard 8:9 16:6
  17:2
standing 15:16
start 8:6,13
starting 7:22
startlingly 9:4
state 1:13,14 35:1
  35:6,7
stated 18:2
states 1:1,10
status 7:21
stayed 9:21
stenographically

35:13
stiffness 12:11
  15:14 17:19
  18:20 19:14
store 14:14,22
  15:1,4
strain 22:23
street 1:15 2:15
  4:10
strength 29:8,13
  30:11,23
stress 23:11 24:7
stressrelated
  24:20
study 32:4,6
suffered 10:5
  22:13,22 31:14
suite 1:15
summarize 8:20
  10:8 17:15 18:19
summary 7:25
support 4:2,22
sure 19:2 25:13
  32:18
surface 21:17
swear 4:23
swelling 9:16
  10:13 20:3
switched 5:21
sworn 4:25 5:3
  35:10
symmetrical 29:11
  30:8,12,20,24
symptom 12:12
  29:20
symptoms 9:15
  10:21 11:6,7
  13:4,9,13 14:20
  23:9 24:4,7,20
  24:21 26:20 27:5
syndrome 21:14,21

T

take 8:10 34:11,15
taken 1:8,11 4:8
  9:12 35:17
talked 15:9 20:2
technically 34:11
telephonically 2:9
  2:19
tell 5:7,15 11:3
ten 14:18
tender 20:9,14
tenderness 20:8,17
  20:23 21:2,24
  22:2 29:15,24,25
  30:16
tendon 30:19

tendons 21:6,7
tested 16:20,22
  18:22
testified 5:3
testify 35:10
testimony 35:15
testing 17:13
  18:25 19:19
  20:19 24:25
tests 10:16,18,20
  11:1,24 16:12
  31:6,12
thank 25:5 33:25
  34:4
thats 6:21 7:11,16
  7:25 8:9,10 9:24
  10:10 11:12 16:7
  16:25 17:1,3,8
  17:22 18:4 21:17
  21:18 24:24
  25:16 26:10,12
  26:17 27:8 28:12
  28:16 29:4,10,17
  29:20 30:1,3,10
  30:18 31:18,23
  32:5 34:1
therapies 12:21
  24:16 26:25
therapy 10:20 11:1
  24:16,17
theres 32:11
things 13:16 16:19
  26:23
think 6:6 7:25
  34:11
third 21:16 33:12
thoughts 24:22
time 4:5 7:14,18
  7:22 8:3 9:15
  11:5,8,16 13:2
  15:17 24:11
  27:22 33:25
  35:18
tingling 12:17
tissues 21:5,5
  22:3
today 4:21 7:5
  22:21
toes 19:6
told 8:21 9:2,3,11
  9:14 10:9,17,18
  11:25 12:10,13
  12:16,19,21
  14:11 31:12,14
  31:18
top 12:4
touch 19:6 29:22
training 6:13

transcript 35:12
traumatic 23:6,11
travel 23:14
traveled 25:23
traveling 13:3,22
treated 10:19 11:4
treating 8:1 11:23
treatment 6:16
  7:23 9:13,18,24
  10:4 21:20 24:3
  24:9,10,12,13,13
  24:18,19 26:24
  33:21
treatments 10:22
  25:2
trigger 20:16,16
  20:18 21:3,13
  22:2
true 35:15
truth 35:10
trying 27:24
tunnel 21:21
turn 7:13 19:10
  22:8
twisting 15:16
two 9:21 28:15
twofold 24:11
type 17:8 22:12,23
  24:16 25:2 26:24
  29:19 33:21
types 15:17 17:20
  22:25 24:13
typewriting 35:14
typical 23:7

U

u 4:2,22
undergo 24:23
undergoing 24:14
  33:11
understanding 7:19
  8:20
united 1:1,10
university 5:18,24
unrelated 21:20
unusual 33:15
upper 15:15 16:16
  19:15 20:15,21
  30:7
use 12:18
usual 6:7
usually 6:14 16:9
  33:22

V

variety 7:7
versus 4:13
video 4:6

| | | |
|---|---|---|
| videographer 4:1<br> 4:21 34:8,13,19<br>videotaped 1:7 4:7<br> 34:22 | youve 14:4 | 40 4:5 18:1 19:13<br>400 26:11<br>45 18:3,10<br>4767400 2:7 |

**W**

wait 34:17
wake 9:4
walk 28:22
walked 28:23
walking 28:18
want 20:24 26:13
 28:4,6 34:10,11
 34:15
wasnt 34:11
week 15:3 33:12
weeks 9:21
welcome 25:7 34:3
 34:5
went 5:22 12:3
 26:8
whats 21:3
whereof 36:1
whos 33:15
wing 9:9
witness 4:24 5:2
 25:7 27:10,14
 28:3 34:3,5 35:9
 35:9 36:1
words 15:7
work 6:12,16 7:8
 14:2,3,8,15 15:4
 15:5,7 27:24
 33:11,11,12,12
worked 6:2 14:17
 14:25
workers 33:22
working 15:21
workplace 6:15
workplaces 6:20
workrelated 6:17
 14:6
worse 12:12,18
writing 26:5

**X**

x 3:1
xrays 10:17

**Y**

yeah 31:2
year 5:20 33:13
years 6:3 7:1
 14:13 28:15
youll 20:1 21:19
youre 6:25 25:7,18
 25:18 31:19 34:3
 34:5

**Z**

**0**

06 36:9

**1**

1 26:11
10 1:17 4:5
1020131cv 4:13
1020131cvlenard
 1:6
11 4:5 14:13 34:9
 34:21
110 1:15
11th 1:16
16 15:3
17 34:9
18 34:21
1970 5:19
1985 5:25
1991 6:2

**2**

2 31:20
20 7:1 18:17 19:9
2009 8:23 11:13
 13:18 22:15 27:6
2010 7:12,14,17
 8:4,21 11:5,13
 13:5 22:7 24:3
 28:11,18 32:8
2012 1:16 4:5
 28:14 36:3
2013 36:9
22 1:15 4:10
22nd 8:23 11:13
 13:18 22:15
25 3:5 18:6,17
255 2:5
26th 36:2

**3**

3 36:9
30 1:17 6:3 19:12
 19:13 28:24
305 2:7,17
33 3:6
331 1:5 22:14
33130 2:16
33134 2:6
35 18:7,18 19:10
3585577 2:17
3rd 7:17 11:13
 24:3 32:7

**4**

**5**

5 3:4
50 18:11

**6**

65 18:13

**7**

**8**

80 2:15 19:7
84003765 1:12 2:25
 35:4 36:11
8th 2:15

**9**

90 19:7